We will hear argument next this morning in Case 09-115, Chamber of Commerce v. Whiting. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. In 1986, Congress converted what had been before that time a merely peripheral concern of immigration policy, that is, how to regulate worker authorization, and converted it into a core concern of immigration policy by the passage of the Immigration Reform and Control Act. This Court has characterized that change in legislation as providing a comprehensive scheme for dealing with those issues. And that characterization is obviously apt because Congress provided for an exhaustive and exclusively Federal method of bringing to the attention of Federal authorities problems in worker authorization, the method by which those matters should be investigated, the method by which they should be adjudicated, all of which are controlled as a matter of Federal, exclusive Federal activity. And indeed, the ultimate judicial review is goes exclusively to the Federal courts of appeals. The sanctioning provisions are very explicit and they are very clear and they are very balanced. And for good reason. Congress realized in this context that if you over-enforce in one direction, that is, if you try to deter the hiring of unauthorized workers, you run a very serious risk of causing employers to err on the side of not hiring others who are, in fact, authorized but who may fall into protected classes. And so Congress very carefully calibrated the penalties on both sides so that the employer essentially would play it straight down the middle and hire the best people for the job under these circumstances while, of course, complying, if at all possible, with the Federal requirements. And so it's against that background. Scalia. Why is that a problem if, as the Federal statute requires and the State statutes require, you have to show an intent to hire an unauthorized worker? Isn't that what the State statutes here require? Well, the State statute has two components to it. One is knowing and one is intent. But I don't see how that's a problem. So why is that a problem for the business? I mean, he's safe so long as he doesn't intentionally hire an unauthorized worker. Well, I think part of the problem is that it is never 100 percent clear precisely who is and who is not an authorized worker. And I think what Congress said was, I'm not going to deal with this problem in the kind of granular way you're looking at it, Justice Scalia. Which is specifically at each of the individual employment decisions. You're going to look at the generality of situations and realize that if you put in one side of the scale what Arizona has done here, which is to say you can essentially have the death penalty to the business, that is completely eliminate the business's right to exist, and on the other side of the scale, a $250 fine, it would be pretty remarkable to say, well, you know, I'm going to hide behind the intent and knowing requirements and instead simply avoid, if at all possible, the risk of Arizona's sanctions being imposed. Well, I think what Arizona would answer to that is, well, that's the only option the Federal Government left us. Well, I'm quite sure that's what Arizona will say. We might have used reticulated penalties or, you know, enforced the Federal law ourselves, but they forbade that, but they did allow us to enforce the law, immigration laws, through licensing, right? So it all essentially comes down to the licensing issue, doesn't it? It does ultimately come down to through licensing laws. And the part of the fundamental problem, obviously, with Arizona's scheme here is that this is not a licensing law. This is a worker authorization sanctioning law. Well, when I picked up this brief and looked at this case, I thought, oh, well, licensing, that's a defined term. I'll look in corpus juris secundum or ALR or something, but it really isn't. Your brief indicates you start with dictionaries. Fair enough. You indicate what Federal licensing laws are. But I see no limitation on what the State can decide is a license in any jurisprudential principle that you cited. Justice Kennedy, I think the better way to try to grapple with the meaning of the licensing law or whether it ought to be construed broadly to allow the State-wide authority to engage in supplemental enforcement in this, or narrowly in order to say that what really ought to happen in this context is if you deal with a situation where the Federal Government has enacted — I'm sorry, has enforced a provision and imposed a penalty through the Federal scheme, that then, as a supplement to that, the State does, in fact, have the authority to add something over and above what the Federal Government has done. But it seems to me quite remarkable to think that Congress intended, through a parenthetical referring to through licensing laws, to allow the State to adopt an entire alternative shadow enforcement mechanism, a non-administrative decision-making process, completely a State-run operation, and even at the end, the sanction is not — is not imposed, ultimately, in effect, by the — by any regulating entity. That would be remarkable only because nobody would think that with this scheme in place, the Federal Government would not enforce it. Of course no one would have expected that. But what Arizona says has occurred here is that the scheme in place has not been in trouble financially and for other reasons because of unrestrained immigration. And therefore, they had to take this — this very massive — I agree this step is massive and one wouldn't have expected it to occur under this statute, but expectations change when the Federal Government has simply not enforced the immigration restrictions. Phillipson, I understand the point and I understand the motivation for why Arizona did what it did. But the problem is the statute was enacted in 1986, and that's when the preemption standards were put in place. And again, the notion, if you look at the way the structure of the statute, and it also responds in some ways to Justice Kennedy's question about how should you read licensing since it's not a self-defining concept, is if you — is if first, Congress said very specifically that the immigration laws should be enforced uniformly, which says that there shouldn't be 40,000 different localities offering up their view of licensing and the additional 50 States. Second of all, and this part I think is particularly telling in terms of this massive State scheme that's been adopted, which is that under Section 1324a)(b)(5), which is in 134a of the appendix, Congress specifically outlaws the use of the I-9 form, and in some ways this goes to your question, Justice Scalia, because it would be inconceivable that the State can, in fact, enforce knowing and intentional decision-making without having access to the I-9 form, because that's. Alito, could I ask you this question to get back to the issue of whether this is a licensing law? Licensing is not an unknown term. States and municipalities issue all sorts of licenses. For example, I think here in the District of Columbia, every business has to have a general business license. Isn't that right? That is true, Justice Alito. Now, if the District of Columbia were, after having enacted this requirement some years ago, were to pass a new ordinance saying, and if you knowingly hire an illegal alien, your general business license can be forfeited, would that not see to be a licensing law? Well, I think the answer to that specific hypothetical is that's still not a licensing law, because it doesn't tie the grant of the license to the revocation powers. I think Congress means for the States to adopt something more specific than that, although I do think eventually. Kennedy, this is the same question, your answer, why is it suddenly not a license because the State imposes an additional condition where it was a license before? I think the question is whether it is a licensing law within the meaning of what Congress intended. I mean, the reality is, Justice Alito, there is no common definition of license in various States and countries. Actually, there is. I mean, it seemed to me when I read this, it sounded a little familiar, and I think whoever wrote it in Arizona copied it out of the Administrative Procedure Act. I mean, you read the definition of license in the Administrative Procedure Act, and this is awfully close. I understand that, Justice Breyer, and I agree with that. But the problem is, is that the State, the Federal law, it doesn't talk about actions with respect to licenses. It talks about licensing laws. Breyer, that's right. It might have meant something different, Congress might have. But what is then the SEIU brief, I thought that was pretty interesting, is that something you adopt, is what Congress did mean? I mean, what do you think Congress did mean, and what evidence is there if it didn't mean the APA definition, what evidence is there for that? Well, the SEIU brief does a very nice job of explaining the particular focus of Congress, obviously, on the Agricultural Workers Protection Act, and in particular, which is, you know, has tremendous significance in terms of narrowing the State's authority here, because obviously in the conforming amendments in that context. It could have named that, if that's all it meant. I'm sorry, Your Honor. It could have named that, that particular licensing scheme, if that's what it meant. But it didn't name it. It said licensing generally. What did it intend to add to that? Barber's licenses? No, I think what's the point? Beautician's licenses? How would any of this have anything to do with the immigration laws? Well, I think what it what Congress actually had in mind, and what's the most natural reading of a licensing law, is the fairly common situation where somebody violates Federal law, usually on the criminal side, and a State licensing entity finds out about a conviction of a Federal crime and says, oh, wait a second, we don't want people to have licenses under these circumstances, and therefore, they can't. That's exactly what they're saying. We have licenses. Justice Scalia, there's a vast difference. I think it's very common to talk about authority to do business within a State as a license. You say license to do business in so many States. It's a common expression. Now, I have my – maybe you'll persuade me otherwise, but I have no doubt that insofar as this law limits the authority to do business within the State, it is a licensing law. It's a little harder extending licensing to formation of a corporation, but when you corporation and enable the limitation of liability that creates. And secondly, you authorize that new creature to do business within your State. So at least half of that corporation law is licensing, it seems to me. Now, if that's what I think, what do you think? Phillips, I think actually if you just receive the articles of incorporation, that doesn't actually in all States necessarily give you the opportunity to do business. It just simply gives you the right to exist, and you may very well need to get a separate document in order to actually do business in a particular State. Scalia, but you do not need the kind of a document that an out-of-State corporation needs if you're an out-of-State corporation. Phillips, no, you don't need to. That's true. That's true. But the reality is that nobody, I think, in common sense and common use of the term, thinks of articles of incorporation or the charter or partnership or any of those documents as licensing, which suggests that the State does it. Sotomayor, could I just focus the questioning, because we keep talking about whether the APA-type definition of licensing is what Congress intended or not, but you don't disagree that Congress at least intended that if someone violated the Federal law and hired illegal aliens and was found, undocumented aliens and was found to have a license, the State can revoke their license, correct, to do business? Phillips, yes. I don't disagree with that, Ms. Sotomayor. Sotomayor, so it really doesn't matter whether they're revoking their right to do business in the State, and they can only revoke their charter or their articles of incorporation if they're – if they were filed in that State. They wouldn't have power to revoke a Delaware law. Phillips, they can't do it. They can't do it in Delaware, right. Sotomayor, all right. So it's stopping them from doing business. So really the only conflict you're talking about is not the power to stop them from doing business, because you accept that the saving clause gives them the power to do that, to revoke the right to do business. What you're talking about is a conflict in the adjudication of that issue. Is that correct? Right, and the enforcement of that issue. All right. So I'm, you know, how they define license or not is irrelevant to me. Walk me through whether what expressly preempts that adjudication right or what implicitly preempts that adjudication right, because that is, for me, what the center of this question is. I think there are three pieces of evidence that respond directly to what you asked, Justice Sotomayor. First is Congress in section 115 of the statute specifically says enforcement should be uniform, which suggests to me that this ought to be exclusively a Federal investigation and adjudication process. Two, the point I was making earlier about the I-9 form, those forms cannot be used in an adjudication. Scalia, don't depart from that. What does that mean, enforcement shall be uniform? I'm sorry? What does that mean, enforcement shall be uniform? The enforcement of the immigration laws should be uniform. Congress stated that as a overarching principle when it enacted section 115. Is that any different from what is the assumed situation with respect to all Federal laws? Are Federal laws not to be applied uniformly? Well, not necessarily. Well, no, I mean, I think it depends on the circumstance. I can imagine a lot of this is — remember, we're talking about immigration policy and immigration law here, and in general you would expect that to be pretty much uniform, but this Court in Dukanis had decided that there are some elements of it that were not, and Congress is simply reinforcing the basic notion that enforcement of it ought to be uniform. Two, doesn't the exception for licensing mean that this isn't going to be completely uniform? One jurisdiction may take the position that a restaurant that employs illegal aliens may lose its restaurant license, its license to operate, and another one may take a different position. So it's not going to be the same. But, Justice Alito, I think that's why it's terribly important to limit, to narrow as much as possible, and it's fully consistent with congressional intent. You were going to say that you think that's the case. The need to get a full sanction done by the Federal Government and then just an add-on on the licensing side rather than an entire regime to enforce the law. But this isn't — it can't be uniformity of sanction because the Court permitted licensing sanction. Right. But only if it's a question of adjudication. What you're saying is what's specifically preempted is the right to adjudicate whether someone has hired undocumented aliens, correct? Yes, Justice Sotomayor. And the last thing I would say with respect to that was the conforming amendments with respect to the Agricultural Workers Protection Act is a situation where the Department of Labor, which used to engage in adjudication as well, was divested of that authority. It seems quite unlikely Congress meant to give that authority to the States and take it from the Department of Labor. I don't see the problem in diverse adjudication. Wouldn't there be a Federal question presented if a company claimed that it was deprived of the ability to do business because of a mistaken interpretation of Federal law that the person it hired was not an authorized person? Wouldn't that be a Federal question that could be? Well, Arizona doesn't purport to be enforcing Federal law here. It has an independent State law basis for the actions that it takes, so that would not arise under Federal law. Doesn't the State law basis refer to the Federal law? Well, it actually, I don't think it does. You thought it tracked it? No, it tracks it, but it doesn't incorporate it. It doesn't purport to be applying it. It's the same standards, but it's still a matter of State law. It's not a Federal law. It's not Federal. It doesn't arise under Federal law. I would like to respond. Thank you, counsel. General Katyal. Thank you, Mr. Chief Justice, and may it please the Court. Nearly a quarter of a century ago, Congress declared Federal employer sanctions central, not peripheral, to the policy of immigration law. Congress broadly swept away State and local laws preempting any sanction upon those who employ unauthorized aliens, with the sole exception being a mere parenthetical for licensing and similar laws. Just to pose there, we've had a little discussion about what licensing laws are, but we haven't talked at all about those last two words, and similar laws. It seems to me that whatever wiggle room or ambiguity there may be in saying whether this is a license or not, Congress swept pretty broadly. It said not just licensing laws, but licensing and similar laws. So first let me tell you, Mr. Chief Justice, what we think a licensing law is, and then deal with the similar question. We think a licensing law, as Congress defined it in IRCA, was the traditional licensing laws that were in place in 1986. Those were largely farm labor contractor laws. They were aimed at fitness to do business, and they had a few essential characteristics in those laws. Roberts, I'm sorry, let me just, I mean, businesses had to have licensing laws pretty much across the board, right? You couldn't set up a, I don't know, electrical contracting business if you didn't weren't licensed to do business or met the requirements for an electrician. And it wasn't just agricultural. Oh, absolutely. But I think that this licensing law looks very different from the ones you're referring to or the farm labor contractor ones for a number of reasons. The first is licensing laws issue licenses. They're genuinely about the issuance of licenses, not simply ones in which licenses are revoked. Second, they're ones in which the issuance of the license, the criteria for issuance, is the same as the criteria for revocation, because they're covered. Scalia, are you saying, and I think the Petitioner here may have been saying as well, that if you have a licensing law that permits the revocation of the license, the revocation is not a licensing law? What I'm saying is, is that a licensing law? Suppose I have a licensing law which says if you do this, your license will be revoked. Does that remain a licensing law? In general, that itself is not a licensing law. Licensing laws share a number of characteristics. Now, we can debate about whether subtracting one or another of those characteristics it will still be. Scalia, the question for licensing laws, therefore, if you can't revoke a license, under it. Because, Justice Scalia, Congress wanted to preserve the State's traditional power for licensing laws, which were about fitness to do business, and what Arizona has done is to do business. Once you're in, you can do whatever you like. You think that's what Congress meant? You can pass upon their fitness when you issue the license, but once it's issued, they can do whatever they like. No, I think that the criteria would be the same for issuance and revocation. And revocation. Okay. So that raises the question, what does it make? Why does it make any difference if the revocation provision is contained in the narrow licensing law, or if there's a general State law which says all licenses that are issued may be revoked for certain reasons? Because, Justice Scalia, what Congress was trying to do was preserve the State's and locality's traditional power for fitness to do business. And one good indicia that fitness to do business is not what was at issue in the particular law is that they will let businesses operate. They will license them without any care whatsoever as to whether they have a history of violating the particular provision. So they should just or Arizona should just amend all its licensing laws to require what they now require when the license is issued and to say in each specific licensing law that it can be revoked for the same, on the same ground. Justice Scalia, that would solve that problem. That would solve the problem. Now, there are other hallmarks of licensing law. Even if they said, and you have to renew your license every year or every six months. That is correct. That itself I don't think is relevant to whether the licensing law is. The other hallmarks are that they have discretionary adjudication by an expert body, that it's not mandatory, that it is genuinely aimed at qualifications to do business. You don't disagree that whether or not a company hires illegal workers is related to quality or sort of ability to do business or qualification? A State could certainly make that part of its genuine fitness to do business law. Now, here Arizona hasn't done that. And we know that because the criteria for issuance of the license are entirely divorced from the criteria for revocation of the license. And if Arizona really believed, Mr. Chief Justice, what you're saying, which is that it's relevant to the violation is relevant to whether they can do business or not, they allow every single one of these entities to get the license. Sotomayor, your argument sounds to me like, look at the law and see what its purpose is. If the purpose is to regulate undocumented aliens, then it's struck down. If it happens to put its revocation provisions in its licensing law, then it's okay. It doesn't make much sense. Justice Sotomayor, I'm not talking about purpose. I'm saying look at the face of the statute and see what it's aimed at. The face of the statute talks only about if you hire undocumented aliens, your license is revoked. Right. So that looks like a punishment statute. There are essentially two boxes here. The saving clause says that it's okay, civil or criminal sanctions, other than through licensing and similar laws. So I mean you can't do business. And this is not a licensing law. Congress essentially had two boxes in 1986. One was the traditional fitness to do business laws, and the other was what Congress thought was the traditional fitness to do business laws. Sotomayor, if we disagree with you, could you answer the question I posed to your adversary, which is what makes the adjudication of status preempted? Absolutely. The Federal adjudication is expressly preempted, State adjudication of a Federal violation is expressly preempted, as well as impliedly so, for three reasons. The first is that Congress, in developing IRCA and the Comprehensive Scheme, set out a series of procedures, Federal adjudication with an ALJ, all sorts of different regulations to the jot and tittle. And what Arizona does here is what 40,000 different localities can do if this law is upheld. Sotomayor, at the time this statute was passed, there were many, many State laws that adjudicated revocation of licenses. Perhaps not many had addressed the issue of hiring undocumented aliens, but many State laws existed that independently adjudicated revocations. What in the legislative history or in the words of the statute show that Congress intended in any way to limit those adjudications? It's undoubtedly the case that without the parenthetical, the mere parenthetical savings clause, that Arizona-like laws would be swept away as sanctions that these are, these are sanctions imposed. So the question is whether the licensing law phrase saves that, and I think it saves a Federal State adjudication. And I think the answer to that is no, because to read the statute that way is to permit all of those States to have their own laws, and it's undoubtedly the case that Congress wanted to sweep away the Dukanis-style State statutes that were in place that imposed sanctions on employers. And so these are sanctions imposed by the State. Roberts, just so I can make sure I understand your approach, you're saying if Arizona had a law saying you have to have a license to do business, and then it became aware of a problem it wasn't aware of before. It found out that a lot of employers were employing child labor and they didn't know they would do that, and they say, we can revoke your license if you're determined to have employed child labor, that that would not be okay? But it would be okay if in the original licensing thing they said, and you can't employ child labor. Well, I think that the answer depends on what Congress was trying to get at. And in 1986, we know what Congress was trying to get at with respect to State enforcement of the immigration laws. They broadly swept away the Dukanis-style laws, and they said for the I-9 provision, which President Reagan described as the keystone of the Act, that I-9 documents can't be used in any procedure besides IRCA procedures. Kennedy, the Chief Justice is going to insist on the answer to his own question. But it seems to me his question is, why isn't that still a licensing? If it has independent adjudication, it is swept away by the first parts of the H-2 statute, which say, which say the provisions of this section preempt any State or local law imposing civil or criminal sanctions. In the child labor example, why isn't that a license, an addition to a regulatory licensing scheme so that it's a licensing law? Because if I understand, I may not understand the hypothetical, but the word provisions refers to the entire subset, the entire statute in IRCA, including the procedural protections, the procedures that follow for Federal enforcement of the immigration law. Would you read that section again? Roberts, as you say, you keep you tried earlier to talk about the two boxes and you said something would be preempted by the first clause. Anything, civil and criminal sanctions are allowed if they are imposed through licensing and similar laws. There are not two boxes. The State can do what's in the first part so long as it does it through licensing or similar laws. Right. And in our position is that this is not a licensing law because it doesn't bear any of the indicia of a traditional licensing law. Is it similar to a licensing law? No, I don't think so. Congress had, when they used similar, meant to sidestep the semantic debate about whether something is a certificate, as some of the farm labor contractor statutes use that term, or a license. No, no, that's all right. Thank you, counsel. Ms. O'Grady. Thank you. Mr. Chief Justice, and may it please the Court. Through their police powers, States traditionally have the authority to regulate the conduct of employers within their jurisdiction to determine what conduct warrants issuance of a State license and to determine what conduct justifies suspending or revoking such a license. And although Congress preempted some of our traditional authority when it enacted IRCA in 1986, it preserved significant State authority through the Savings Clause that permits a State to impose sanctions through licensing and similar laws. How do you answer the anomaly that Arizona cannot impose a fine, even in a modest amount, but it can revoke someone's license to do business? Your Honor, we think that looking at the Savings Clause, we don't view it as an anomaly. The structure that Congress established is one that the State's authority is determined by the nature of the sanction that we choose to impose. We don't have the authority to impose they took away our authority to impose civil sanctions through the Savings Clause. Kennedy, but underlying Justice Ginsburg's question is why would Congress want to do that? Well, I think it makes sense, Your Honor, because in terms of licensing, it provides some accountability, because we are the entities that establish policy for our licensees, and we are the ones accountable for whether that business remains in business or whether we're taking it away from them. So it makes sense. Perhaps Congress never expected that the States would have to resort to such massive measures, and they probably wouldn't have if the law had been uniformly enforced and vigorously enforced, right? You didn't have any notion of doing this sort of thing in 1986, did you? Your Honor, certainly we waited until 2007. So maybe Congress wasn't worried about it, because it seemed very unlikely that anything like that would occur. Perhaps. But I think also Congress was recognizing what this Court recognized in DeCanis was that unauthorized employment has significant local consequences, so they did not want to fully preempt State law. They wanted to preserve State's freedom. The main anomaly seemed to me to be this, that in the Federal Act, as was the first point that the chamber made, that it's a fairly careful balance. There are a group of people in Arizona. They may look as if they come from Mexico or speak with an Hispanic accent, and you're not certain whether they in fact are illegals or that they're legal. Now, think of that category. Congress has passed a statute that gives the employer just as much incentive to verify so there's no discrimination as to dismiss so there's no illegal hiring. It's absolutely balanced. A thousand-dollar fine for the one, a thousand-dollar fine for the other. So Arizona comes along and says, I'll tell you what, if you discriminate, you know what happens to you? Nothing. But if you hire an illegal immigrant, your business is dead. That's just one thing they do. Now, how can you reconcile that intent to prevent discrimination against people because of their appearance or accent? How do you reconcile that with Arizona's law? If you're a businessman, every incentive under that law is to call close questions against hiring this person. Under the Federal law, every incentive is to look at it carefully. Your Honor, a couple of points. First, in terms of how our law works, we do have a prohibition against investigating any complaint that's based solely on race. So if we get a complaint that says those people all look Mexican or Hispanic, that does not get investigated under Arizona law, first. We also have criminal penalties if frivolous complaints are filed. Beyond that, we have the use of E-Verify, which is an added protection for employers to prevent the hiring of unauthorized aliens. So if they use E-Verify, if they're in good faith compliance with the I-9 process, they have no risk of exposure under Arizona law, just as true under the Federal law. Sotomayor, I'm — doesn't it frustrate the congressional intent when the Federal law says that the I-9 can be used for no purpose other than the Federal adjudication of whether a violation has occurred or not? Doesn't it frustrate that law to have the States raise a defense that depends on forcing someone to disclose something that the Federal law protects? This is a vicious circle. Federal law says you can't do the I-9 for — you can't use it for any purpose other than the Federal adjudication. Now, you're creating a defense that says you have to supply us with something that Federal law otherwise protects from disclosure. Your Honor, we don't think that the Federal law prohibits the use of an I-9 — of the I-9 — an employer's use of the I-9 in a State proceeding, that these can be used under the Federal proceeding or in the State. But beyond that, if at some point in an actual enforcement action it was determined that Federal law did have that impact, they would still have that defense available to them. They would just have to, you know, prove it up in a different way other than just the form. Sotomayor, doesn't it frustrate Federal law when the Federal law says that I-9 can be used for no purpose other than the Federal adjudication of the status of employees? I think that's — Here's what the law says. It may not be used for purposes other than for enforcement of this chapter. And we believe that a State enforcement action under the authority for preserving sanctions through licensing and similar laws would fall within that. So we think they should be able to use that. The employer should be able to use that. Alito, isn't there a difference between saying it may not be used for any purpose other than for enforcement of this chapter and other provisions of Federal law on the one hand, and saying on the other hand it may not be used for any purpose other than in a Federal proceeding? The enforcement, the I-9 certainly could be used in a Federal proceeding by the employer. Would that then — would that be used for the enforcement of the Federal law? I wouldn't think so. That's true, Your Honor. That's — that's— Breyer, you have a question on the I-9. I'm not certain. I thought under Federal law that if the employee, the employer isn't certain, but the employee says here's my Social Security card, here's the driver's license, the employer looks at that, he's home free. Is that right? But under Federal — under your law, under Arizona law, he's not home free. And moreover, because he's not home free, he still could be prosecuted. Is that right or not? No, that's not right, Your Honor. So if he shows the driver's license under Arizona law, if he shows a driver's license and Social Security card to the worker, the employer looks at it, the employer cannot be prosecuted? Well, Your Honor, we would need the evidence that the person knowingly employed  I thought, in reading it, that it creates some kind of presumption, but he's not home free. No, Your Honor. But under Federal law, he is home free. The substantive requirements under Arizona law and Federal law are the same. We're imposing no new obligations. So then he's home free. If he — look, I don't — I'm trying to understand. Maybe it's not enough time to explain it. But I thought Federal law requires this E-9 business or whatever that E-review is. And I was worried about the E-review, which it seemed to require, because it seemed to me in 20 percent of the cases where the notice is, this guy is not authorized, we don't have any record that he's authorized to work, 20 percent of those are wrong and he is authorized to work. So the employer who follows that is really going to fire 20 percent of the people who will be absolutely entitled to work. And so I'd just like you to address those points as you wish. And let me walk through how our law works and see if this addresses the concerns. So the — Arizona doesn't change anything in terms of the use of the I-9. We retain the same defense that's in the Federal law for good faith compliance with the I-9. We do require employers to use E-verify, although we don't impose a sanction on that employer if they don't use E-verify. Ginsburg. Can you explain that E-verify, because this is a Federal resource, and the Federal government has said we want this to be voluntary. How can Arizona take a Federal resource, which the Federal government says is voluntary except in certain circumstances, and turn it into something that's mandatory? We think the quest — that question is answered by looking at, you know, the conflict preemption analysis, because Congress didn't address the role of the States with regard to E-verify. And we are— I don't get into any preemption or not, but Arizona wants to use a Federal resource. And the Fed makes it available on if the employer can use it voluntarily, but not mandatorily. How can — how can Arizona set the rules on the use of a Federal resource? Your Honor, we can, as long as it's not a burden to the objectives of Congress. We think that we can require employers within our jurisdiction to use E-verify. Do you make it mandatory? Well, our statute says you shall use E-verify. We don't impose a penalty against employers who fail to use it. The consequences are the same as they are under Federal law. You just don't get the safe harbor. Isn't that the only consequence? That's right. You don't get the safe harbor under E-verify. Now, for the use of E-verify, we did add, after this lawsuit was filed, some additional requirements similar to what they have under the Federal system, where you can't get State contracts, you can't get State grants. But you are taking a mechanism that the Congress said would be a pilot program that is optional, and you're making it mandatory. It seems to me that's almost a classic example of a State doing something that's inconsistent with the Federal requirement. Well, again, we look at the test for conflict preemption in terms of does this make it impossible to comply with Federal law? No. It's really a question of are we interfering with Congress's, excuse me, the Federal government's ability to achieve its goals, and the goal in developing E-verify is to have a more effective verification system. If they fail to do it, then they cannot receive any, quote, grant, loan, or performance-based incentive, end quote, from the State. That's what the law says, isn't it?  And the answer to Justice Scalia's question is, yes, there is that penalty. It isn't simply hortatory. Well, there's no penalty in terms of getting fined. What you do is you lose any grant, loan, or performance-based incentive. Is that right? That's true under current law. That's not what the plaintiffs challenged. Does this lawsuit challenge that? It does not, Your Honor. They just challenge subsection. You're under the old law, and the only sanction is you lose the safe harbor, if that's a sanction. That's right. That's right, Your Honor. So in answer to Justice Breyer's earlier question, in fact, relying on the I-9 does not provide a safe harbor, because under the E-verify system, you can't just rely on the I-9 forms and statutes. You have to rely on the E-verify. Well, Your Honor, we have the same – it's modeled after the Federal law. So just as Federal law has a defense for employers who in good faith follow I-9, so does the State law. The Federal law and the State law do seem to be exactly the same on this point, but I have – I don't understand how these two provisions fit together when E-verify is used. If – suppose an employer – the first thing the employer does is receive the forms from the employee for the I-9 process. It looks at the forms. Well, they reasonably seem to be authentic. So that employer now has the good faith defense that's provided under – by the I-9 process, under both Federal law and State law. But under both Federal law and State law, the employee – employer either must or may also use the E-verification system. The employer gets back a notice of nonauthorization. But what – and that creates supposedly a rebuttable presumption under both systems that the employee is not authorized to work. How does that fit together? If you have a complete defense for having used the I-9 process in good faith, the whole E-verification process seems to be irrelevant under both Federal law and State law. I don't understand how they fit together. And, Justice Alito, we haven't wrestled that in practical application, and I'm not aware of them reaching that point under the Federal system either, but – because it does seem at some point if you – that the system should work, that if you have used I-9 and you get back a final nonconfirmation, not a tentative nonconfirmation, that that employee is unauthorized, that that, you know, seems like it should carry greater weight in an enforcement action. But as – on an as-applied basis, I'm not sure how that plays out in an actual enforcement action. Roberts Could you – I wasn't quite sure what she meant. Judge Schrader, in her opinion for the Court, emphasized that this statute was being evaluated on its – on its face, and that, she said, as-applied particular challenges might arise. How would that work? If we determine this is not preempted, how would – on its face, how would an as-applied challenge come about? I think, Your Honor, perhaps if we – perhaps in terms of what are the outer limits of our definition of license, and they're saying this is – we are outside the definition of licensing in similar laws in a particular case, perhaps that would be an as-applied type challenge. I think some of the I-9 concerns are perhaps more appropriately resolved in a – in a direct case where that issue has arisen on an as-applied basis. And I think she was concerned about some of the real implementation questions that were wrapped into the legal challenge. But for the most part, I think the general framework of our statute is appropriate for in – in this challenge. Scalia So you think after this case we can look forward to cases one by one or all the various types of licenses? And those would be as-applied challenges and would not have been resolved by this case? You're really wasting our time here, aren't we? My hope is, Your Honor, that we get sufficient time. Sotomayor Wouldn't it be easier, if that's Justice Scalia's concern, to take the solicitor general's position that if you're adjudicating good faith or intent differently in any way from the Federal Government, that it's preempted? Isn't that what waiting for an as-applied challenge means, whether or not you are putting different requirements on proving good faith? Justice O'Connor No, Your Honor. And – and because I was trying to give some examples of the kinds of things that may come up as a practical matter, but I think we can get the guidance from this case and proceed in implementation time. Sotomayor Well, let – let – let me ask the question directly. If Arizona's system does not permit an employer to rely on non-suspect documents, the I-9 documents that are permitted employers to rely on, if the Arizona system says, no, you can't rely on those, is that preempted or not? You can't rely on I-9. Or the Arizona system says – on the I-9 documents. Or the Arizona system says you can't hire someone who hasn't been approved under the e-verification system. Is that preempted? Justice O'Connor I think those would both be problems. I think we need to be consistent with the structure and the obligations that are imposed on people. In terms of our sanctions provisions. Scalia Are you conceding that any variation from the Federal standards for – for criminal and civil liability is automatically precluded? I mean, as I read the exception, it's an exception for State licensing and similar laws. And it doesn't say, so long as those licensing and similar laws go no further than what – than what the Federal Government has done. I mean, we often allow States to impose regulatory requirements that go beyond the regulatory requirements that the Federal Government has imposed, and that is not automatically considered to be preempted. So why – why are you conceding that Arizona cannot go a whit beyond what the Federal Government says? Justice O'Connor Because I think what Congress preserved for us was our ability to impose sanctions, including the suspension and revocation of State laws. But I do think they established a uniform national standard. I don't think we could, for example, establish a strict liability offense in Arizona. We'd have to have a scienter requirement, as they have in Federal law. Breyer Now, what I'm trying to get to is what I was looking at specifically is Federal law says if you look at the driver's license and social security card, those are I-9 docs, then the employer has established an affirmative defense and has not violated the law. That's what it says in, you know, the site 27A or whatever. Okay? That's the Federal law. Arizona law that I was reading, maybe there's another place I should read, is it says on determining whether he's an unauthorized alien, the court should consider the Federal Government's determination, it creates a rebuttable presumption. That means it might be rebutted. Okay? So I see a difference there. And the reason that that's relevant is because my first question, if you are an employer, prior to your law, it's 50-50. I better verify, because if I'm discriminating, you know, da, da, da, and it's not that hard, I just look at the driver's license and I look and I'm home free and the social security card, and if I hire an illegal immigrant, the same thing, da, da, da. Okay? So same both ways. Your law. Employer, look at that driver's license and social security, you are not home free. Employer, if it turns out that you've been hiring this illegal immigrant and he's not an American, your business is finished. But what happens if I discriminate? Under our law, nothing. Now, that was the original point they made. That's why I brought up this question of difference in standards, and I want to be absolutely clear what your answer to that is. And I'm hoping I am being clear, Mr. Justice Breyer. We have the same standards of Federal law. We have the same I-9 defense that's in Federal law. Well, where is it in the statute, then, because what I read were the words ''rebuttable presumption'' and I might be reading the wrong words, so tell me where it is. Okay. Let me get to it. And let me explain our rebuttable presumption while I find the specific statutory site for our I-9 process. Well, it's on page 184 to 85 of the appendix to the petition, isn't it? And 178A is the provision, for the purposes of this section, an employer that establishes it as complied in good faith with the requirements of 8 U.S.C. 1324a)(b, establishes an affirmative defense, et cetera. So that's the provision that provides the I-9 defense. Okay. So the rebuttable presumption issue, and this is how that comes into play, we have to, in bringing an enforcement action, have to rely, the State, in making its case, has to rely on information from the Federal government regarding whether someone is authorized or unauthorized. We have to rely on that information from the Federal government. We bring our action in State court if we have verification from the Federal government that that person is unauthorized. We have additional information that we've established the scienter requirement. Then we bring our action, but the employer has an opportunity to rebut the evidence that we've presented in a State court proceeding. It may be, you know, that person doesn't work for us or some other type of evidence. So that's the role of that rebuttable presumption, Your Honor. Roberts. Okay. Thank you. I see that. Certainly. So in terms of the prior adjudication. Just so you know, I interpret your answer as confirming the implication of Justice Kagan that there is a substantial difference in Federal and State law on this point. I mean, you've told about, Your Honor, you know what lawsuits are about. If you're home free by driver's license and Social Security inspection under Federal law, and you're not under State law, that is a difference. And our standards are the same, and it's subsection J, which we have the I-9 affirmative defense. So you think you are home free under State law? To the extent that you would be home free and you'd have the benefit of that good faith defense. It's an affirmative defense under both. Yes, Your Honor. But you have no good faith complaint. The main point, I mean, I'll check that. I think maybe I was mistaken, perhaps, in that I was looking at the other section. But then we're still stuck with this enormous discrepancy in penalty. I mean, I'm characterizing it as enormous, but it seems like the, you know, it's even on discrimination versus under the Federal law. It's not even your business is out to lunch, gone, and on the other side it has nothing. What about that one? I think, Your Honor, that that is the natural consequence of the savings clause that Congress itself enacted. The savings clause itself, the word licensing, now, not everyone looks at this. But I did look at the legislative history. And when you look at that paragraph on page 39 of the red brief, it seems to me that that paragraph says what it means. It says precisely what it is. It says, the first thing it says is that, look, if you're found to have violated this, where is it? It's page — here it is. Suppose somebody has been found to have violated the sanctions provision in the Federal legislation. You found, he's been found by the Federal Government. Then what the State does, it can revoke his license. Okay? That's one thing. And the second thing it says, it wants to — doesn't want to preempt fitness to do business laws, such as State farm labor contract laws or forestry laws. In other words, it's thinking of some precise set of licenses. And that's why this licensing thing was there. And the very next part of this Federal law are conforming amendments, and those conforming amendments apply to departments of government that were concerned with maintaining State farm labor contractor laws. Now, I grant you, you have to go beyond the text, but some of us do because we get enlightenment. And going beyond that text, it seems to me we should follow what that House report says. Now, what is your response to that? Well, first, of course, we would focus on the text, where Congress could have, but did not. They didn't limit it. Well, I said, yes, I got a broad licensing. But let's deal with the part where you look at their explanation as to why they put those words there. Okay. First, the farm labor contractor is simply an example, and I think it says such as, an example of the type of licensing provisions that existed at this time that addressed that. So that's not an all-inclusive universe of sanctions that of licensing laws that might be subject to this. They also don't specifically say there has to be a prior Federal adjudication, that sentence has passive voice, has been determined, without specifying who is making that determination, and it specifically refers to State and local processes that provide for the suspension and revocation of State licenses. And then the sentence goes beyond. Then there's a following sentence that says, you know, further, we don't intend to disrupt laws such as these forestry and other, you know, fitness to do business. We think this is a fitness to do business law, in that we are establishing as a State standard that if you engage in this conduct of knowingly employing unauthorized aliens, we are going to have the ability to take an action against that license that we have given you to do business in our jurisdiction. So we think we fit within that last sentence of the, of the legislation. Ginsburg-Can you also explain the I-9, you said it's the same as in the PED, home free if you have documents, Social Security, driver's license, but you also require the E-Verify. So how, does the E-Verify information modify the I-9? How, how do those two? They work in our system, Your Honor, as they do under the Federal law, that you get a rebuttable presumption if you, in your favor, if you've used E-Verify. But the affirmative defense, if you've used I-9, and I am, there is that caution, it is good faith use of the I-9 system. We do have examples, for example, if an employer is terminated because they are unauthorized and they show up with a different name and different papers two weeks later, you're not going to be able to establish your good faith. So you're home free, but subject to that good faith limitation. But we do incorporate the same obligations that exist under Federal law. And also, I wanted to address more on the farm labor contractors and the amendments, and what we think they were doing in those amendments was simply dividing responsibility at the Federal level between the Department of Labor and their processes that preexisted IRCA and what they were establishing in IRCA, and said we're not going to have these determinations of whether the farm labor contractor has employed an unauthorized alien through a Department of Labor process, we're going to instead use the IRCA-established process. But importantly, what Congress did not change in the agricultural worker regulations was the provision that addresses State law. It said before IRCA and after IRCA that those laws, those Federal laws only supplement the authority of the States, and that means that they preserved all of the State authority that they had before IRCA in the area of farm labor contractors. And that, I think, is reinforced by the legislative history that, again, reinforces that those have been preserved through IRCA. This is an area that has traditionally been within the mainstream of State police power. We acknowledge that Congress does have the authority to preempt us, but they left important discretion in terms of our ability to impose sanctions through licensing and similar laws. And we are doing so by establishing this scheme that provides for the suspension and revocation of State licenses. It's an important part of the balance that Congress struck when it enacted IRCA by addressing what State authority would exist after that congressional enactment. I think the lower courts properly determined the scope of that provision, and unless there are further questions, I thank you for your attention this morning. Roberts. Thank you, counsel. Mr. Phillips, you have three minutes remaining. Thank you, Mr. Chief Justice, and once again, may it please the Court. I want to begin, frankly, where Justice Sotomayor pointed me to before, which is the question of whether or not there really is a basis for allowing the States to independently investigate and to independently adjudicate these matters. And what is the evidence that Congress did not intend that? Justice Breyer quoted from the House report, recognizing not everybody accepts that, but it does seem to me to articulate a very common sense limitation that says you have to have a Federal adjudication in the first instance, and once you've got that, then the State is allowed to add that sanction. That principle seems to me is reinforced by the limitation on what you can use the I-94. Justice Alito, you asked that question, but it does seem to me quite clear that what Congress envisioned in 1986 when it adopted this is you're going to have an exclusively Federal enforcement scheme including the adjudicatory process, and it is only in that context that you're allowed to use the I-9. And the notion that the State could adopt a standard of intentional or knowingly and not be able to have the I-9 materials available seems to me flatly at odds with each other, and therefore, it cannot be that Congress intended under those circumstances to allow these matters to be adjudicated in that particular fashion. Ginsburg. What can, Mr. Phillips, what can the State do that would be complementary rather than conflicting? Phillips. It seems to me the easiest, and of course, this has nothing to do with what Arizona does, but the easiest is if an employer is convicted of violating PRCA in a criminal sanction, and he happens to be a barber, and the State licensing law says, and the if you're convicted of a Federal crime, you will lose your license, it is available to the State under those circumstances. I think this is exactly what Congress had in mind, to issue a notice to show cause why that particular person shouldn't have the license revoked and then go from there. Scalia. It's convicted by a Federal government that hasn't gone after many convictions. Phillips. Justice Scalia, that's the whole problem. No, but Justice Scalia, it seems to me the whole question here, and first of all, I don't think preemption can be a moving target. I think you have to decide it on the basis of what Congress had in front of it in 1986. But remember, Congress was balancing three, at least, very difficult problems, minimizing burdens on the employers, minimizing the discrimination against people who are permitted to be hired, and avoiding hiring people who are not permitted to do so. And how you properly reconcile that is very difficult. But the one thing that seems to me clear is that that was a choice Congress meant to leave to itself and to the Federal government to sort out and not to give the States the opportunity to come in where they did and just say one last word about E-Verify. Roberts. Except, well, you're just kind of blinking over the Savings Clause, except through licensing and similar laws. So that's not a real reservation by Congress of this power to itself. Well, if you interpret the Savings Clause as I do, which means that truly as a State it is a supplement to Federal adjudication, then it is a very narrow limitation on that basis. Because at that point, you've already invoked the entirety of the Federal scheme and it doesn't modify the balance on those broader legal issues, Your Honor. Thank you, counsel. The case is submitted.